Hibbard E. Broadfoot and Helen C. Broadfoot v. Commissioner.
Broadfoot v. Commissioner
Docket No. 36067.
United States Tax Court
1952 Tax Ct. Memo LEXIS 106; 11 T.C.M. (CCH) 878; T.C.M. (RIA) 52255; August 20, 1952
*106 During 1946, petitioner Hibbard E. Broadfoot was a member of a joint venture with one William B. North to exploit an invention of North's for applying shingles to roofs, including slate roofs. Under the terms of the joint venture, petitioner and North were to share equally in the profits, but if there were losses petitioner was to bear them alone, as North had no money. During 1946, petitioner paid out of his own funds $3,007.68 to keep the joint venture going. At the end of 1946, petitioner had a severe heart attack and on account of this illness the joint venture with North was abandoned. The joint venture had no income and petitioner never recovered any of the $3,007.68 which he had advanced to the joint venture either by insurance or otherwise. Held, petitioner is entitled to deduct the $3,007.68 in question either as his distributive share of a partnership loss under section 182(c) of the Internal Revenue Code, or as a loss in a transaction entered into for profit under section 23 (e) of the Code. Charles A. Scharf, Esq., for the petitioners. S. Jarvin Levison, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioners' income tax of $908.46 for the year 1946. The deficiency is due to two adjustments which the Commissioner made to the net income reported by petitioners on their return. These adjustments are explained in the deficiency *108 notice as follows: "(a) and (b) The deduction of $3,934.74 which amount is included in the miscellaneous deduction of $5,472.24, for advances made to the North American Roofing and Supply Company, Incorporated, has been disallowed because such amount was an advance to the corporation and therefore not deductible. "The balance of the deduction of $5,472.24, or $1,537.50, representing payments made on guaranteed loans on behalf of National Home Products, Inc., is a non-business bad debt deductible as a short-term capital loss subject to the limitation provisions of Section 117 of the Internal Revenue Code, * * *" To the foregoing adjustments made by respondent petitioners assigned errors as follows: "a. The Commissioner erred in disallowing to taxpayers the deduction of $3,274.84 as an ordinary and necessary expense for the production and collection of income, or for the management, conservation and maintenance of property held for the production of income, within the meaning of § 23 (a) (2) of the Internal Revenue Code; or as a loss sustained during the taxable year incurred in the taxpayer's trade or business, or in a transaction *109 entered into for profit, within the meaning of § 23 (e) (1) and (2) of the Code; or as taxpayer's distributive share of the net loss of a partnership, within the meaning of § 182 (c) of the Code. "b. The Commissioner erred in disallowing to taxpayers the deduction of $2,197.40 as bad debts incurred in the taxpayer's trade or business which became worthless during the taxable year, within the meaning of § 23 (k) (1) and (4)." The issue raised by assignment of error has been settled by stipulation of the parties and effect will be given thereto under Rule 50. Assignment of error still remains to be decided. However, petitioners in their brief concede that $267.16 which petitioner paid to William J. O'Neil is not deductible against ordinary income. Therefore, of the $3,274.84 deduction which petitioners claimed under assignment of error they now claim only $3,007.68. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Hibbard E. Broadfoot and Helen C. Broadfoot are individual citizens of the United States residing at 123 Hobart Avenue, Short Hills, New Jersey, and resided at the above address at all times material to this controversy. *110 The return for the period here involved was filed with the Collector of Internal Revenue for the Fifth District of New Jersey. Hibbard E. Broadfoot (for convenience sometimes hereinafter referred to as the "petitioner") has been connected with the securities brokerage and investment business since 1919, and is at the present time sales manager for Hayden, Stone & Company. In the past the petitioner became interested in a number of business ventures. In 1937, petitioner was introduced to William B. North, who had invented a new method for applying shingle roofs. Petitioner became interested in North's invention and advanced approximately $5,000 to North to aid him in obtaining a patent, which was granted on March 7, 1939, and was registered at the Patent Office in the name of William B. North. The method for applying shingle roofs covered by the patent (for convenience sometimes hereinafter referred to as the "North-Method") consists of the application of slate shingles or shingles fabricated from other materials by utilizing bronze clips. Clips are employed to effect maximum utilization of each shingle and to reduce the proportion of each shingle covered by succeeding courses. *111 One of the first opportunities for the petitioner to profit from the North-Method of roofing arose from a contract dated January 5, 1938, pursuant to which the petitioner, in consideration for the aid he had given North in obtaining the patent, was granted a 20 per cent interest in a contract dated July 7, 1937, between North and the Flintkote Company pertaining to the North-Method of roofing. The contract with the Flintkote Company granted that company the right to use the North-Method of roofing for the application of asphalt shingles as opposed to slate shingles. The next attempt to exploit and profit from the North-Method of roofing which involved the petitioner was the utilization of the method on a large apartment building at Eastchester in Westchester County called Interlaken Gardens. This was the first large apartment house in the construction of which the North-Method of roofing was employed and the petitioner financed the payroll of this undertaking with his own funds. In 1940, an additional attempt was made to exploit the North-Method of roofing. In that year the petitioner caused to be incorporated and became president of North-American Roofing Supply Co., Inc. Initially, *112 approximately $8,700 was contributed by various brokerage customers of the petitioner as capital of this corporation, and additional financing in excess of $20,000 was provided by the petitioner individually. The corporation completed some projects but never actually realized any profits. It was just in the process of realizing sufficient income to meet expenses when wartime restrictions prohibited the use of bronze clips for roofing. On October 8, 1941, the petitioner informed North that he would not furnish any additional financing to the corporation. At that time there were not sufficient funds available to meet the expenses of the corporation and by December 31, 1941, the corporation was insolvent. During 1942, the corporation attempted to obtain Government contracts covering construction in Alexandria, Virginia, in order to obtain a priority for materials. The corporation was unsuccessful in this endeavor and ceased functioning during 1942. On April 1, 1944, the corporation's charter was revoked by the State of Delaware for non-payment of franchise taxes. The next attempt to profit from the North-Method of roofing had its beginning in 1945. On May 14, 1945, William B. North *113 wrote to the petitioner concerning a new arrangement to take advantage of the expected postwar building boom to exploit the North-Method of constructing slate roofs. The letter, after referring to conversations had with the petitioner in New York in the preceding week and the availability of materials, continued as follows: "It is my intention to open a sales-company to operate with five selected reroofing contractors. To operate this sales company on the basis of selling 500 squares of slate and clips monthly to these selected contractors. To increase these sales as conditions warrant i.e. our ability to purchase more slate and clips than the available quantities mentioned above. "To sell this restricted quantity of slate and clips on a basis of $2.00 per square gross profit or an operating gross profit of $1,000.00 monthly. To do this amount of business it will cost $500.00 monthly based as follows: monthly salary to myself $350.00, traveling expenses $100.00, office rent stenographic expense mail and telephone $50.00 monthly or a total of $500.00." * * *
"To do the above I feel it will be necessary to have three months operating expenses or $1,500.00 available. My present *114 plans are to be in New York Wednesday May 23rd. By this date I trust your decision will be to make this amount of financing available and that you will have made the necessary arrangements." Under the new arrangement referred to in the letter of May 14, 1945, North and the petitioner orally agreed to share equally whatever profits were realized from operating in the slate application business and from selling slate and clips. It was also agreed that royalties received from other contractors licensed under the North patent would in the first instance be employed to pay investors who had lost money in the North-American Roofing Supply Co., Inc. When the North-American Roofing Supply Co., Inc., was in existence, North alone was entitled to royalties under the patent; however, under the new arrangement the parties agreed that after the investors who had lost money in the corporation had been paid, the royalties were also to be shared equally by North and the petitioner. Under the new arrangement it was understood that the petitioner was to make advances for North's office expenses, travel expenses, and living and miscellaneous expenses. It was understood that there was no obligation *115 on the part of North to refund any of the payments made by the petitioner should the arrangement entered into between the two result in losses to the petitioner. During 1946, under the new arrangement, North rented office space from which he called on architects and builders for the purpose of obtaining orders for slate, and also contacted owners of slate quarries in order to obtain slate. Due to the difficulty of obtaining slate after World War II, during 1946 in addition to financing the undertaking, the petitioner expended $75 and $50, respectively, on trips he made to Bangor, Pennsylvania, and Albany, New York, to obtain slate for the venture. In Bangor he went to the North Bangor Slate Company and the Albion Vein Slate Company, but when these companies were approached concerning the possibility of supplying the petitioner and North with an inventory of slate, they stated that they would not supply any slate until certain bills were paid which had been owing by the North-American Roofing Supply Co., Inc., since 1941. Therefore, in an effort to obtain slate the petitioner paid $1,080.68 to the North Bangor Slate Company and $145 to the Albion Vein Slate Company, which represented *116 the past due accounts of the defunct North-American Roofing Supply Co., Inc. The trip to Albany, New York, was made in an attempt to buy the Reising-Nelson Slate Company to obtain slate, which attempt, however, was unsuccessful. During 1946, under the arrangement evidenced by the letter of May 14, 1945, the petitioner also advanced a net amount of $1,611 to North for expenses and paid $46 directly toward the rent of office space occupied by North. The petitioner was never compensated by insurance or otherwise for the advances he made during 1946 to North on behalf of the venture, or for the direct payments he made on its behalf during that year since the venture obtained no slate and realized no income. During December 1946, the petitioner suffered a severe heart attack, as a result of which and on his doctor's advice, the petitioner terminated his connection with North and the venture in which they had been jointly engaged since 1945. The heart attack was so severe that the petitioner was forced to stay away from his place of employment until March 1947. The arrangement between the petitioner and William B. North evidenced by the letter from William B. North dated May 14, 1945, was *117 a joint venture entered into for profit from royalties on the patent on the North-Method of roofing and from the sale of slate and clips, and petitioner was a member of the joint venture. Pursuant to the terms of the joint venture, any operating income therefrom was to be shared equally between petitioner and William B. North, as were royalties received on the patent after investors in the defunct North-American Roofing Supply Co., Inc. had been repaid for royalties. On the other hand, in accordance with the terms of the joint venture, petitioner was to sustain the entire loss of the joint venture without any contribution from North. North had no money with which to share any losses. The net amount of $1,611 advanced by petitioner to William B. North on behalf of the joint venture, $145 paid directly by the petitioner to the Albion Vein Slate Company on the old account of North-American Roofing Supply Co., Inc., $1,080.68 paid directly by petitioner to the North Bangor Slate Company on the old account of North-American Roofing Supply Co., Inc., $125 paid by the petitioner for trips to Albany, New York, and Bangor, Pennsylvania, in an effort to obtain slate, and $46 paid directly *118 by petitioner to John Oakhill for rent constituted expenditures of the joint venture paid during 1946. The venture realized no income during that year and the total loss of $3,007.68 was the petitioner's distributive share of the ordinary net loss of the joint venture for the calendar year 1946. None of the loss was distributable to North because it was understood and agreed that petitioner would stand whatever losses were incurred. It has been stipulated that: The petitioner is entitled to $2,197.40 non-business bad debts, deductible as a short-term capital loss, on guaranteed loans on behalf of National Home Products, Inc. in lieu of the $1,537.50 nonbusiness bad debts allowed in the notice of deficiency. The petitioner is entitled to an additional deduction for interest of $37.50 with respect to one of the guaranteed loans of National Home Products, Inc.
Opinion BLACK, Judge: Originally there were two issues in this proceeding but by reason of the stipulation filed by the parties at the hearing only one of these issues remains for our decision. Petitioners in their brief state the issue which remains for our decision as follows: "Are the petitioners entitled to a deduction *119 of $3,007.68 for the calendar year 1946, where one of the petitioners was a member of a joint venture which incurred an ordinary net loss of that amount during that year, either as that petitioner's distributive share of the ordinary net loss of a partnership pursuant to Section 182 (c) of the Code, or, in the alternative, as a loss incurred in a transaction entered into for profit pursuant to Section 23 (e) of the Code." Respondent does not dispute that petitioner was out-of-pocket the $3,007.68 which he claims and that he never recovered any of it back. But respondent denies the right of petitioner to deduct the $3,007.68 in question from his gross income and in so contending respondent relies largely on Welch v. Helvering, 290 U.S. 111. Petitioner contends that Welch v. Helvering, supra, is distinguishable from the facts of the instant case since the holding of the Supreme Court in that case was based upon the fact that the taxpayer there attempted to deduct payments made to acquire an asset, good will. On the other hand, contends petitioner, "a payment made to obtain an inventory is without question an ordinary expense of carrying on a business." Petitioner *120 points out that in a situation analagous to the one which we have here, the Tax Court held that payment of debts of an insolvent subsidiary corporation by a parent in order to restore the parent's credit standing was deductible as an ordinary and necessary business expense. Petitioner cites as such a case, L. Heller & Son, Inc., 12 T.C. 1109. In the L. Heller & Son, Inc., case we said: "But even if there were no binding commitments, petitioner's standing in the business community, its relationship to the jewelry trade generally, and its credit rating in particular, characterized the payments as calculated to protect and promote petitioner's business and as a natural and reasonable cost of its operation. Harris & Co. v. Lucas (C.C.A., 5th Cir.) 48 Fed. (2d) 187. As such, they are deductible in any event as ordinary and necessary business expense. Scruggs, Vandervoort-Barney, Inc., 7 T.C. 779; Catholic News Publishing Co., 10 T.C. 73." The theory that these were capital expenditures is disposed of in the following language in Harris & Co. v. Lucas, supra: "It is argued, however, on behalf of respondent, that the *121 expenditures were in the nature of the purchase of good will, * * * a capital asset. * * * Good will consists largely of a reputation for competence, honesty, and fair dealing, but its value is in attracting customers and not in securing credit. The establishment of credit to purchase does not at all guarantee that it will continue over a period of years. * * *
"It is perfectly plain that the payments did not constitute capital investment." We concluded our opinion in the L. Heller & Son, Inc., case by saying: "We find it unnecessary to determine whether the payment is to be more accurately and technically described as a loss or a business expense. Claim is made on both grounds. Cf. Merton E. Farr, 11 T.C. 552, * * * On one or another, the deduction should be permitted." In the instant case we agree with petitioner's primary contention that petitioner is entitled to deduct the $3,007.68 in question as his distributive share of an ordinary loss of a partnership (joint venture) with William B. North in 1946, pursuant to section 182 (c) of the Code. If we should be wrong in holding that there was a partnership (joint venture) between petitioner and North in *122 1946, then we hold that petitioner is entitled to deduct the $3,007.68 as a loss incurred in a transaction entered into for profit pursuant to section 23 (e) of the Code. Decision will be entered under Rule 50.